ORAL ARGUMENT NOT YET SCHEDULED

No. 11-3080

IN THE

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

FRASER VERRUSIO,
Defendant-Appellant.

ON APPEAL FROM A JUDGMENT OF CONVICTION ENTERED IN THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA,
DIST. CT.  NO. 1:09-CR-00064 (Hon. RICHARD W. ROBERTS)

## BRIEF FOR THE UNITED STATES

LANNY A. BREUER
 Assistant Attorney General

JOHN D. BURETTA
 Deputy Assistant Attorney General

DAVID V. HARBACH, II                    KIRBY A. HELLER
 Deputy Chief                           Appellate Section, Criminal Division
                                        U.S. Department of Justice
EMILY RAE WOODS                         950 Pennsylvania Ave., NW
 Trial Attorney                         Washington, DC  20530
 Public Integrity Section               (202) 307-0085
                                        kirby.heller@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), undersigned counsel certifies as follows:

**A.    Parties and Amici**

The parties appearing in the district court were the United States of America as plaintiff and Fraser Verrusio as defendant.  The parties appearing in this Court on appeal are the United States as appellee and Verrusio as appellant.  Counsel for the U.S. House of Representatives has informed the parties that the U.S. House of Representatives intends to participate as amici curiae.  There are no intervenors.

**B.    Rulings Under Review**

Verrusio is appealing the final judgment of conviction (App. 441-46) that the district court (Hon. Richard W. Roberts) entered on September 6, 2011.  There are no official citations to the judgment.

**C.    Related Cases**

Counsel is aware of no related cases.


 s/ Kirby A. Heller
KIRBY A. HELLER

i

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES. .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

GLOSSARY OF ABBREVIATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . ix

JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTES, RULES, AND REGULATIONS.. . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.    Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.    The Events Leading Up To Verrusio's Acceptance Of The Illegal Gratuity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     C.    Hirni Offers And Verrusio Accepts An All-Expenses-Paid Trip To A World Series Game At Yankee Stadium... . . . . . . . . . . . . . . . 5

     D.    Verrusio Assists The Lobbyists In Their Efforts To Advance United Rentals' Legislative Agenda After The World Series Trip. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.    The Evidence Sufficiently Proved That Verrusio Accepted And Conspired To Accept An Illegal Gratuity... . . . . . . . . . . . . . . . . . 17

     A.    Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.    Standards Of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    The Lobbyists Offered The World Series Trip For Or Because Of Verrusio's Assistance In Inserting The Proposed Amendments Into The Highway Bill, And Verrusio Knew That Was Their Motivation When He Accepted The Trip.. . . . . . . . . . . . . . . . . 22

    1.    The Meaning of "Official Act" and the Required Link with the "Thing of Value.". . . . . . . . . . . . . . . . . . . . . . . . . . 22

    2.    The Evidence Was Sufficient on Counts 1 and 2.. . . . . . . 24

II.    The District Court Did Not Violate Verrusio's Fifth And Sixth Amendment Rights By Quashing The Trial Subpoena To A Former Congressional Aide Who Invoked Her Testimonial Privilege Under The Speech Or Debate Clause.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.    Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B.    Standard Of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.    Verrusio Waived His Challenge To The District Court's Order Granting Curry's Motion To Quash The Subpoena; In The Alternative, The District Court Did Not Plainly Err.. . . . . . . . . 37

D.    The District Court Did Not Err In Denying Verrusio's Motion To Dismiss The Indictment.. . . . . . . . . . . . . . . . . . . . . . . . . . 42

III.    The Evidence Was Sufficient To Support Verrusio's False Statement Conviction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

A.    Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

B.    Standard Of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

C.    The Evidence Was Sufficient To Prove That Verrusio Knowingly Omitted Information In Schedule VI And Made A Material False Statement When He Certified That His Financial Disclosure Report Was Accurate.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IV.    The District Court Did Not Abuse Its Discretion In Excluding The Instructions For Completing The Travel Disclosure Sections Of The Financial Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.    Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B.    Standard Of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . 54

C.    The District Court Did Not Abuse Its Discretion In Excluding The Schedule VII Instructions.. . . . . . . . . . . . . . . . . . . . . . . . . 54

D.    Even If The Court Erred By Excluding The Evidence, The Error Was Harmless... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . 62

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . 63

iv

# TABLE OF AUTHORITIES

## CASES

*Branzburg v. Hayes,* 408 U.S. 665 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Brown and Williamson v. Williams,* 62 F.3d 408 (D.C. Cir. 1995). . . . . . . . . . . 38

*Christoffel v. United States,* 200 F.2d 734 (D.C. Cir. 1952).. . . . . . . . . . . . . . . . 44

*Eastland v. United States Servicemen's Fund,* 421 U.S. 491 (1975).. . . . . . . . . 38, 39

*Gravel v. United States,* 408 U.S. 606 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Jaffee v. Redmond,* 518 U.S. 1 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Johnson v. United States,* 520 U.S. 461 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Kotteakos v. United States,* 328 U.S. 750 (1946). . . . . . . . . . . . . . . . . . . . . . . . . 58

*Krieger v. Fadely,* 211 F.3d 134 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 37

*Rovario v. United States,* 353 U.S. 53 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Taylor v. Illinois,* 484 U.S. 400 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Ahn,* 231 F.3d 26 (D.C. Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Akhigbe,* 642 F.3d 1078 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . 36

*United States v. Anderson,* 509 F.2d 312 (D.C. Cir. 1974). . . . . . . . . . . . . . . . . 31

*United States v. Brewster,* 408 U.S. 501 (1972).. . . . . . . . . . . . . . . . . . . . . . . . 24, 32

*United States v. Brewster,* 506 F.2d 62 (D.C. Cir. 1974).. . . . . . . . . . . . . . . . 23, 32

*United States v. Carson,* 464 F.2d 424 (2d Cir. 1972).. . . . . . . . . . . . . . . . . . . . 29

*United States v. Coumaris,* 399 F.3d 343 (D.C. 2005). . . . . . . . . . . . . . . . . . . 58

*United States v. Edmond,* 52 F.3d 1080 (D.C. Cir.1995). . . . . . . . . . . . . . . . . 42

*United States v. Hall,* 613 F.3d 249 (D.C. Cir. 2010), cert. denied, 131 S. Ct. 1471 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Hoffman,* 556 F.3d 871 (8th Cir. 2009). . . . . . . . . . . . . . . . . 32

*United States v. Levine,* 72 F.3d 920. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Moore,* 612 F.3d 698 (D.C. Cir. 2010). . . . . . . . . . . . . . . 21, 50

*United States v. Moussaoui,* 382 F.3d 453 (4th Cir. 2004). . . . . . . . . . . . . 41, 42

*United States v. Nixon,* 418 U.S. 683 (1974). . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Nwoye,* 663 F.3d 460 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . 41

*United States v. Olano,* 507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Rayburn House Office Building, Room 2113, Washington, D.C.*, 497 F.3d 654 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*United States v. Renzi,* 651 F.3d 1012 (9th Cir. 2011), cert. denied, 132 S. Ct. 1097 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Reynolds,* 345 U.S. 1 (1953). . . . . . . . . . . . . . . . . . . . . . 43, 44

**United States v. Ring*, 2013 WL 276020 (D.C. Cir. Jan. 25, 2013). . 15, 27, 28

*United States v. Shabban,* 612 F.3d 693 (D.C. Cir. 2010). . . . . . . . . . . . . . . 26

*United States v. Stadd,* 636 F.3d 630 (D.C. Cir. 2011). . . . . . . . . . . . . . . 50, 53

\* Authorities upon which the government chiefly relies are marked with an asterisk.

vi

*United States v. Stearns,* 387 F.3d 104 (1st Cir. 2004). . . . . . . . . . . . . . . . . . 36, 37

*\*United States v. Sun-Diamond Growers,* 526 U.S. 398 (1999). .  22, 23, 26, 27, 32

*United States v. Taylor,* 497 F.3d 673 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . 36

*United States v. Turkish,* 623 F.2d 769 (2d Cir. 1980). . . . . . . . . . . . . . . . 42, 43

*United States v. Valenzuela-Bernal,* 458 U.S. 858 (1982). . . . . . . . . . . . . . . . . 44

*United States v. Warren,* 42 F.3d 647 (D.C. Cir.1994). . . . . . . . . . . . . . . . . . 59

*United States v. Yakou,* 428 F.3d 241 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . 21

*\*Valdes v. United States,* 475 F.3d 1319 (D.C. Cir. 2007). . . . . . . . 21, 23, 26, 27

*Washington v. Texas,* 388 U.S. 14 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## FEDERAL CONSTITUTION, STATUTES, AND RULES

U.S. Const., art. I, § 6, cl. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 201(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 201(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 201(c)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 31

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 666. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 1001(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 46, 50

18 U.S.C. § 1001(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 32(a)(7)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Fed. R. App. P. 32(a)(7)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Fed. R. Evid. 501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**TREATISE**

23 Wright and Graham, *Federal Practice and Procedure*.. . . . . . . . . . . . . . . . . . 43

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| App. | Appendix for Appellant |
| Br. | Brief for Appellant |
| DE | District Court Docket Entry |
| EPW Committee | Senate Committee on the Environment and Public Works |
| FBI | Federal Bureau of Investigation |
| GX | Government Exhibit |
| Highway Bill | Federal Highway Bill |
| Supp.App. | Supplemental Appendix for Appellee |
| Transportation Committee | House of Representatives Committee on Transportation and Infrastructure |

# JURISDICTION

This is an appeal from a conviction in a criminal case. The district court (Roberts, J.) had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. Judgment was entered on September 6, 2011, App. 441, and Verrusio filed a timely notice of appeal on August 15, 2011, App. 447. This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1. Whether the evidence sufficiently proved that Verrusio accepted from lobbyists an all-expenses-paid trip to New York "for or because" of an official act performed or to be performed on their behalf.

2. Whether the district court erred by granting a former Congressional aide's motion to quash a trial subpoena without first balancing her testimonial privilege under the Speech or Debate Clause against Verrusio's need for the evidence, and whether the district court erred by denying Verrusio's motion to dismiss the indictment based on the unavailability of her privileged testimony.

3. Whether the evidence was sufficient to support Verrusio's conviction for making a material false misrepresentation on his financial disclosure statement.

4. Whether the district court abused its discretion in excluding from evidence instructions for completing the official travel sections of the financial disclosure statement.

## STATUTES, RULES, AND REGULATIONS

All applicable statutes are included in the addendum to Verrusio's opening brief.

## STATEMENT OF THE CASE

On June 14, 2010, a federal grand jury in the District of Columbia returned a superseding indictment charging Verrusio with conspiring to obtain illegal gratuities, in violation of 18 U.S.C. § 371 (Count 1); accepting an illegal gratuity, in violation of 18 U.S.C. §§ 201(c) and 2 (Count 2); and making and causing to be made a materially false statement, in violation of 18 U.S.C. §§ 1001(a)(2) and (c)(1).  App. 33-49.  A jury convicted Verrusio on all counts.  App. 400.  The district court sentenced Verrusio to one day of imprisonment, to be followed by two years of supervised release.  App. 443-44.

This appeal followed.

## STATEMENT OF FACTS

Viewing the evidence in the light most favorable to the verdict, the jury could have found the following facts.

### A.    Overview.

Verrusio was the Policy Director for the Committee on Transportation and Infrastructure in the House of Representatives ("Transportation Committee").  His

2

responsibilities included acting as a liaison between members of the Transportation Committee and the affected industry and their lobbyists. As a senior staff member, he had the ear of Representative Don Young, the chair of the Transportation Committee, and advised him and the Committee as a whole on legislative strategies and policy. App. 188-191; Supp.App. 22, 46, 130.

The Transportation Committee had responsibility over the Federal Highway Bill, a massive piece of legislation requiring reauthorization every six years. Beginning in 2003, it was the Transportation Committee's primary focus. App. 187, 190; Supp.App. 131.

On the Senate side, responsibility for the Highway Bill was vested in the Committee on the Environment and Public Works ("EPW Committee"). Trevor Blackann was a legislative assistant to Senator Kit Bond, the chair of the EPW subcommittee that had primary responsibility for drafting the Senate version of the bill. App. 187-88, 212.

Todd Boulanger was an experienced lobbyist with Jack Abramoff's group at Greenburg, Traurig. Boulanger and his colleagues at Greenburg, Traurig sought out Congressional staffers and other public officials who were "receptive to our advances and . . . were likely to do what we asked." App. 186. Boulanger considered Blackann a "champion" – "somebody that basically on Capitol Hill

3

became an extension of [Greenberg, Traurig's] lobbying company.  They basically did whatever we asked."  App. 197.  Although Verrusio was not a "champion," Boulanger "had a good relationship with him" and "wanted to improve the sort of working relationship and develop him into a champion."  App. 197.  In the past, Boulanger had asked Verrusio for help on behalf of several clients and had bought meals and drinks for Verrusio.  App. 191-196; Supp.App. 18-19.  For his part, Verrusio had provided Boulanger with "[p]olitical intelligence that was important to [Boulanger's] clients" and "inside information" that wasn't yet "public knowledge."  Supp.App. 18.

James Hirni was also a lobbyist, first for the law firm of Sonnenschein, Nath & Rosenthal (February 2003 through December 2003) and then for Greenberg, Traurig (January 2004 through March 2004).  He knew Verrusio socially from seeing him at Signatures (Abramoff's restaurant) and other restaurants and bars.  Supp.App. 51-54.

### B.  The Events Leading Up To Verrusio's Acceptance Of The Illegal Gratuity.

In August or September 2003, United Rentals, a nationwide construction-equipment company, hired lobbyists Boulanger and Hirni to advance the company's interests on Capitol Hill.  The lobbyists, in consultation with their United Rentals point-of-contact, Todd Ehrlich, devised a legislative strategy that

4

included inserting three amendments into the Highway Bill to give United Rentals a "leg up." App. 187. These amendments related to providing incentives for state transportation departments to contract with builders that rented rather than bought construction equipment, as United Rentals was in the business of renting construction equipment. App. 186-87.

Boulanger and Hirni discussed United Rentals' legislative interests with Blackann, and Blackann, in turn, talked about them with Verrusio. App. 220; Supp.App. 23. The two staffers knew that there would be opposition from the sellers of construction equipment, and they "discussed the idea of waiting till the last possible minute legislatively to insert the [rental preference] provisions." App. 221. Verrusio was "fairly adamant that that's the route [they] needed to take." App. 221. Blackann apprised Boulanger and Hirni that the two staffers had agreed upon that "airmail" strategy. App. 221.

### C. Hirni Offers And Verrusio Accepts An All-Expenses-Paid Trip To A World Series Game At Yankee Stadium.

On October 16, 2003, Ehrlich told Boulanger that he had tickets to the World Series and asked whether "there were any government officials that we would be interested in taking that could be helpful to [United Rentals] on the projects that we were working on at the time." App. 188. The two decided that Blackann and Verrusio should be invited because "they were in positions to be

5

helpful . . . specifically . . .with "[t]he United Rentals' amendments that we were seeking to include in the highway bill."  Supp.App. 19-20.  Boulanger knew Verrusio "was close to the chairman proper," App. 188, and hoped "to influence" Verrusio "to do some things for our clients," Supp.App. 21.  Boulanger further believed Verrusio would accept the all-expenses-paid trip because "he had received things from me in the past and never objected."  Supp.App. 21.

Boulanger could not go on the trip, and Ehrlich therefore emailed Hirni about the tickets.  Supp.App. 55.  They too talked about whom they should invite "for the benefit of the company," and Ehrlich passed on Boulanger's recommendations.   App. 243.   Hirni "agreed that they would be the right Congressional staff."   App. 243.   Hirni also thought "they would likely be receptive to a trip of this nature."  App. 244.  Hirni knew that Blackann "was always somebody that was accepting gifts; as to Verrusio, Hirni "just had the sense that he would be open to a trip like this," App. 245, and that he "understood the concept of being helpful to lobbyists," App. 287.  Hirni told Ehrlich that he would contact the staffers and make the arrangements.  App. 247.

Hirni extended the invitation to Verrusio and Blackann and told them that United Rentals would cover the costs.  Both were excited and accepted.  App. 250- 52.  Hirni and Verrusio exchanged a series of emails about logistics; in one,

6

Verrusio informed Hirni that he was "[t]hinking I will fly up earlier if possible. . . Can you make it happen?" Supp.App. 56. In another, Hirni provided information about the hotel and added, based on Ehrlich's representation that United Rentals executives would be attending the pre-game dinner, "very important business dinner." App. 249, 255.

Hirni and Blackann flew to New York together and met Ehrlich at the Bryant Park Hotel, a luxury boutique hotel in midtown Manhattan. Supp.App. 25, 45. Over drinks in the lobby, Blackann described to Ehrlich the airmail strategy that he, Verrusio and the two lobbyists had agreed was "the best course of action." Supp.App. 26. Ehrlich, however, preferred to show his bosses something more immediate. Supp.App. 26. Hirni, Blackann, and Ehrlich then proceeded in a chauffeured Cadillac Escalade to Sparks Steak House. Verrusio met them at the restaurant, having emailed Hirni that he would be late. There were no United Rentals executives at the dinner, and Verrusio did not question their absence. Supp.App. 57-64. The men "talked a lot" about United Rentals and "got into a conversation about concepts and ideas United Rentals had for federal legislation." Supp.App. 64. As "the senior guy at the table," Verrusio "was leading the conversation," and he explained to Ehrlich that the airmail

7

strategy was "the best chance for ultimate success."  Supp.App. 27.  Ehrlich paid for the dinner and drinks; neither staffer offered to chip in.  Supp.App. 65-66.

On their way to Yankee Stadium, the Escalade first stopped at a convenience store, and Hirni bought several airplane-sized bottles of alcohol for the group.  The driver then took them to the stadium.  The men stayed until about the seventh inning.  On their way out, they stopped at a merchandise stand, and Verrusio signaled to Hirni and the vendor that he and Blackann wanted two jerseys.  Supp.App. 27-29, 67-68.  Hirni, who had been ribbed by the others about not being a "good lobbyist" and not taking care of "important staff," paid for the jerseys with his corporate credit card.  Supp.App. 69-70.

At Ehrlich's suggestion, the driver then took the group to a Manhattan strip club.  Hirni paid the cover charge and for drinks; Ehrlich paid for several lap dances for Verrusio and others.  Hirni also bought Verrusio and Blackann tee shirts with the club's logo.  Supp.App. 30-31, 71-74.

The group left the strip club at about 2 a.m. and, after stopping for pizza, returned to the hotel.  The next morning, Hirni paid the hotel bills, and Verrusio, Blackann, and Hirni took a town car to the airport and flew back to Washington, D.C.  Supp.App. 76-78.

The total cost of Verrusio's trip was $1259.77: the roundtrip airfare was $228.50; his hotel and room service costs at the Bryant Park Hotel were $301.27; the face value of the World Series ticket was $110; the World Series jersey was $130; and his pro rata share of the costs for the chauffeured Cadillac Escalade, dinner and drinks at Sparks Steak House, and strip club was $490.  App. 225.

The participants all recognized that the trip served no official purpose. Verrusio and Blackann did not visit United Rentals' Connecticut headquarters or any of the company's facilities located throughout the New York metropolitan area, and the timing of the trip was dictated solely by the availability of Ehrlich's World Series tickets.  App. 223, 251, 287; Supp.App. 89-90.  Hirni admitted that he "used those tickets in [an] attempt to influence the Congressional staff for legislation," Supp.App. 86, and Blackann knew that he and Verrusio were invited "because of who we worked for, where we worked," and that the usual criteria for official business trips, such as visiting a facility or attending a conference, "were [not] really met in this particular instance," App. 222-23.  When Blackann returned from New York, he sent Hirni an email saying "[T]hanks again for the invite to the game.  Sorry neither Fraser nor I could make it but maybe next time," which was his "back handed way" of saying "thanks but let's not talk about [the trip]."  Supp.App. 32.

9

Verrusio also admitted that he "believed he was asked to go because Ehrlich and Hirni wanted to get something done on the United Rentals agenda," but acknowledged that the trip "served no official purpose." Supp.App. 47. Verrusio did not seek permission for the trips from his bosses, and he did not disclose it as either a gift or as official travel on the financial disclosure statement that he was required to file. If he had disclosed the trip as official travel, he "would have had to have misrepresented what the trip actually was, meaning he would have had to have said it was an official trip when, in fact, it wasn't an official trip." Supp.App. 49.

### D. Verrusio Assists The Lobbyists In Their Efforts To Advance United Rentals' Legislative Agenda After The World Series Trip.

Hirni told Boulanger that "he came away [from the trip] thinking that [Verrusio] was going to be helpful." App. 197. Three days after he returned from New York, Hirni forwarded to Verrusio an email from Boulanger that "listed a series of legislative items and some legislative text that United Rentals was now pushing," and he asked whether Verrusio had time to discuss it. Supp.App. 79. Verrusio was at a Congressional retreat at the time but responded a few days later that "it needs a lot more work for anyone to be able to help with progress." App. 262-63.

10

Because the Senate was moving more quickly on the Highway Bill than the House, the lobbyists focused on the relevant committees in the Senate, and Blackann immediately went to work on the United Rentals agenda. Blackann notified Verrusio that Blackann's office was going to "actually work to get something in the Senate version of the bill," and, as Blackann expected, Verrusio gave him "[a] bit of a dressing-down," telling him: "we're going to get killed, you know about all the opposition, . . . you're going to get your hat handed to you, don't do it." Supp.App. 34.

Aided by Blackann's "heavy lifting behind the scenes," the United Rentals amendments made it into the Senate version of the bill. App. 198. During this same time period, Hirni kept Verrusio "in the loop," and Verrusio, in turn, helped Hirni understand "the likelihood of the Senate language working in the House," "when the House was going to act, and who the key players on the committee . . . would be." App. 264-65.

As Verrusio predicted, there was substantial opposition to the amendments, and he gave Blackann "the I-told-you-so." Supp.App. 42. Boulanger, Hirni, and representatives from United Rentals met with Verrusio, and Verrusio suggested that they counter the opposition's letter writing campaign with their own grassroots movement in the districts of key Committee members. App. 202, 266-

11

67.    Verrusio provided specific "advice and counsel" on the letter writing campaign and "guidance on how to move forward in the process."  App. 267; *see also* Supp.App. 86.  Verrusio also suggested they "get elected members on [the House Transportation committee] to weigh in with the chairman in support of the provisions that we had included in the Senate bill."  Supp.App. 8.  Hirni identified Congressman Boozman, with whom he had a relationship, as one possibility, and pursued the matter with Boozman's staff.  Supp.App. 8-9.  On January 14, 2004, Hirni emailed Boozman staff member Vivian Curry, "I've spoken to [Verrusio] and he is good to go."  Supp.App. 10.  According to Hirni, the phrase "good to go" meant that Verrusio was "going to be helpful with our legislative asks."  App. 271.  Hirni also told Curry in his email that "[Verrusio] asked us to give him the language plus what we would want in the perfect world" and that he was "resending [Verrusio] the language in the Senate bill with changes which would represent the 100 percent victory for UR."  Supp.App. 10.

Boulanger continued to ask Verrusio for updates on the status of the bill and the United Rentals amendments.  Supp.App. 12.  On January 20, 2004, Verrusio emailed Boulanger that the markup on the bill was still scheduled for February 4 and that they were "[s]till hard at it . . . dissenting views still loom with some in leadership - stay tuned."  Supp.App. 13.  In response to Boulanger's email asking

12

"[i]n your gut, what are the odds?" and noting that "[t]his seems like a total mess," Verrusio stated that "far from a total mess . . . no question there are issues, but we still feel good." Supp.App. 13-14. Boulanger emailed back, "Your game is strong. I'm interested to see how this plays out. You hitting [Signatures restaurant] tonight?" Supp.App. 14.

Based on information he received from his lobbyists, Ehrlich also was optimistic. Ehrlich reported to other United Rentals executives that, although "[Associated Equipment Distributors] are lobbying to take [our provisions] out and creating disinformation to do it," "[o]ur guys don't think it is going to be a problem. We have a much stronger relationship and we are already in the bill, and soon to be in the house bill." Supp.App. 91. Ehrlich testified that his reference to a "stronger relationship" meant that "[o]ur lobbyists had a much stronger relationship [than the opposition] with the Hill, the people that write the laws." Supp.App. 92.

The opposition nonetheless continued to press its case in the House, and Verrusio alerted Ehrlich's replacement at United Rentals, Richard Haselwood, that the lobbyist for the Associated Equipment Distributors "has been hounding me to visit on this issue, FYI." Supp.App. 7-8. Verrusio also forwarded to

13

Haselwood an email and attachment Verrusio had received from the lobbyist describing the opposition's position.  Supp.App. 6-8.

Eventually, Blackann told Boulanger and Hirni not to pursue the amendments in the House because "it would only make [the opposition] more upset."  Supp.App. 14.  The lobbyists "felt that in a conference situation [between the House and the Senate], that we had the right relationships in place where we could keep it in there if push came to shove."  Supp.App. 15; *see also* Supp.App. 35-36.  Verrusio was at the "preconference" meeting in which Blackann, as the Senate designee, presented the United Rentals amendments to the House.  Blackann had previously attended about one-third of these preconference meetings and had not seen Verrusio at any of the others.  Supp.App. 36-37.  Ultimately, United Rentals told its lobbyists that it was no longer interested in pursuing the amendments, and the Senate provisions were stripped by the conference committee.  Supp.App. 16.

## SUMMARY OF ARGUMENT

1.   The evidence sufficiently established that Verrusio accepted, and conspired to accept, an illegal gratuity.  A reasonable jury could conclude that United Rentals and its lobbyists offered Verrusio the World Series trip to reward his past and future help in getting the United Rentals amendments into the

14

Highway Bill and that Verrusio accepted the trip knowing that they invited him for that reason.  Verrusio's assistance satisfies the "official act" element of the illegal gratuity offense.  His help pertained to a pending matter before the Transportation Committee – whether the amendments should be included in the Highway Bill – and a jury could reasonably conclude that the lobbyists did not offer the trip merely because of Verrusio's position or to cultivate his general goodwill.  The government was not required to prove that Verrusio actually assisted United Rentals, although it did, or that he intended to assist the company when he accepted the illegal gratuity.  Verrusio's challenges to the "official act" allegations in the superseding indictment also lack merit because this Court "treats the question whether an action constitutes an 'official act' as one of 'sufficiency of evidence.'"  *United States v. Ring*, --- F.3d ---, 2013 WL 276020, at *7 (D.C. Cir. Jan. 25, 2013).

     2.  Verrusio waived his claim that the district court erred by granting a former Congressional staffer's motion to quash a trial subpoena based on her testimonial privilege under the Speech or Debate Clause without first balancing the interests protected by the witness's privilege against Verrusio's interest in securing favorable evidence.  Verrusio never asked the district court to conduct

15

such a balancing and agreed that the staffer's communications and testimony were privileged under the Speech or Debate Clause.

Even if the court were to review the claim for plain error, Verrusio has not satisfied any of the prongs of that standard. A criminal defendant's rights under the Compulsory Process and Due Process Clauses cannot displace the Speech or Debate Clause's absolute testimonial privilege, and no court has considered, let alone held, that a court must balance the competing interests. Verrusio also has not shown that the staffer's testimony would have been material. For those same reasons, the district court did not err in denying Verrusio's motion to dismiss the superseding indictment based on the witness's unavailability.

3. The evidence was sufficient to support Verrusio's conviction for making a material false statement on his 2003 Financial Disclosure Statement. Verrusio falsely certified that his statements on the form were complete and correct even though he knowingly omitted the World Series trip from the form's gift schedule. The misstatement was material because it affected the ability of the House Ethics Office and its staff to review the form and to monitor compliance with governing ethics rules. There was no need for additional testimony on the House rules governing official travel because the disclosure form was clear on its face, and

16

other evidence enabled the jury to decide whether the trip should have been disclosed as official travel instead of as a gift.

4. The district court did not abuse its discretion in excluding from evidence the instructions for completing the travel disclosure sections of the Financial Disclosure Statement. Because Verrusio was not charged with making misstatements on that schedule, the instructions were not relevant and were likely to confuse the jury. In addition, the instructions to the gift schedule made clear that travel-related expenses provided for the filer's personal benefit had to be reported on the gift schedule. Even if the court erred, it was harmless because the evidence overwhelmingly established that the trip was not official travel. And instructions were not essential to Verrusio's defense because he could rely on other evidence to argue that the travel was in connection with his official duties and that he was not required to obtain prior approval before accepting Hirni's invitation.

## ARGUMENT

## I.    The Evidence Sufficiently Proved That Verrusio Accepted And Conspired To Accept An Illegal Gratuity.

Verrusio challenges (Br. 19-37) his gratuity convictions on the ground that the indictment did not charge, and the government did not prove, that he received the World Series trip "for or because" of his past and future "official acts" on

17

behalf of United Rentals' efforts to insert favorable amendments into the Highway Bill. Verrusio's challenges lack merit.

### A.    Background.

Count 1 of the superseding indictment alleged that Verrusio conspired to violate the anti-gratuity statute and Count 2 alleged that he accepted an unlawful gratuity. App. 33-45. The "General Allegations" section of the superseding indictment alleged that Verrusio's responsibilities as Policy Director for the Transportation Committee included outreach to businesses and industry groups that had an interest in legislation pending before the Transportation Committee, relaying information from those groups to "the Committee's leadership," and "arranging meetings between representatives of those groups and entities and Committee members and staff." App. 34-35. It also alleged that Verrusio's responsibilities "specifically included working on the Federal Highway Bill." App. 35. Count 2 alleged that Verrusio accepted a trip to New York "for and because of his official assistance provided and to be provided to Equipment Rental Company's[1] efforts to secure favorable amendments (which were previously described in the "General Allegations" section) to the Federal Highway Bill."

---

[1] The superseding indictment did not identify United Rentals by name.

18

App. 44.  That allegation was followed by a "to wit" clause listing six examples of Verrusio's assistance.  App. 44-45.

Before trial, Verrusio unsuccessfully moved to dismiss Counts 1 and 2 on the ground that the superseding indictment did not allege that he committed "official acts" within the meaning of Section 201(a)(3).  App. 69-92, 173-80.  Verrusio also moved for judgment of acquittal at the close of the government's case, Supp.App. 113-25, and renewed that motion after trial, App. 365, 487-508.  Although the district court reserved decision before the verdict as to Count 2, it ultimately denied the motions in their entirety.  App. 322, 376, 430-35.

The district court's charge to the jury mirrored the statutory definitions and applicable case law.  Supp.App. 134-35.  The court instructed that "[s]tanding alone, providing gifts of meals, entertainment, tickets and the like to public officials is not a crime, even if the gifts are provided by someone seeking to curry favor or influence with those officials."  Supp.App. 135.  The court elaborated as follows:

> It is not illegal for a lobbyist to give a thing of value to a public official merely to cultivate a relationship or to build a reservoir of goodwill that might ultimately affect one or more unspecified acts now or in the future. The fact that gifts or hospitality might make a public official willing to take a lobbyist's telephone call or might provide the lobbyist greater access to the official's appointment schedule is not enough by itself to demonstrate either the lobbyist's intent to provide illegal gratuities or the public official's intent to accept illegal gratuities.  Therefore, you cannot find that a lobbyist

19

provided illegal gratuities to Mr. Verrusio or that Mr. Verrusio accepted
illegal gratuities if you find that the intent was limited only to the cultivation
of a business or political relationship.

Supp.App. 135. *See also* Supp.App. 135 ("[I]t is not enough to show that the

defendant accepted the gratuity simply because of his position."). The court also

quoted the statutory definition of "official act" and added that the five terms in

Section 201(a)(3) ("question, matter, cause, proceeding or controversy") "refer to

a class of questions or matters whose answer or disposition is determined by the

Government." Supp.App. 135. It repeated that "[m]ere favoritism, evidenced by

a public official's willingness to take a lobbyist's telephone call to answer general

questions, or to meet with a lobbyist, is not an official act" and that the jury must

find that Verrusio "accepted the thing or things of value for or because of a specific

official act he performed or was to perform." Supp.App. 135.

　　　In response to a jury note about the meaning of "accepting a thing of value

for or because of any official act," the court responded as follows:

> In order to satisfy this element of Count Two, the government need not
> prove that the defendant ever agreed with the person or persons giving the
> thing of value to carry out a specific official act, or prove that the defendant
> ever carried out the specific official act, or prove that the defendant had the
> intent to carry out a specific official act to assist the giver.
>
> What the government must prove beyond a reasonable doubt, though, is
> that at the time that the defendant accepted the thing of value, the defendant
> understood that the person or persons giving the thing of value gave it for

or because of a specific official act that the defendant had performed or that the giver expected the defendant to perform in the future.

Supp.App. 164.  Verrusio substantially agreed with that instruction.[2]  Supp.App. 161-62.

## B.     Standards Of Review.

This Court reviews *de novo* the district court's denial of Verrusio's motion to dismiss the indictment.  *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005). It also reviews the sufficiency of the evidence *de novo*.  *Valdes v. United States*, 475 F.3d 1319, 1322 (D.C. Cir. 2007) (en banc).  The Court "must affirm the jury's verdict of guilty if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *United States v. Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010).  "In making this determination, [the Court] view[s] the prosecution's evidence in the light most favorable to the Government and giv[es] full play to the right of the jury to . . . draw justifiable inferences of fact."  *Ibid.* (internal quotation marks and citation omitted).

---

[2]  Verrusio objected to the last two clauses in the first paragraph ("or prove that the defendant ever carried out the specific official act, or prove that the defendant had the intent to carry out a specific official act to assist the giver") because they were not responsive to the jury note.  Supp.App. 161-62.

**C.    The Lobbyists Offered The World Series Trip For Or Because Of Verrusio's Assistance In Inserting The Proposed Amendments Into The Highway Bill, And Verrusio Knew That Was Their Motivation When He Accepted The Trip.**

        1.    <u>The Meaning of "Official Act" and the Required Link with the "Thing of Value."</u>

As relevant here, Section 201(c)(1)(B) makes it a crime for a public official to "directly or indirectly . . . receive[], accept[], or agree[] to receive or accept anything of value personally for or because of any official act performed or to be performed by such official." Section 201(a)(3) defines "official act" as "[1] any decision or action [2] on any question, matter, cause, suit, proceeding or controversy, [3] which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3).

The alleged "official act" must be "specific." *United States v. Sun-Diamond Growers*, 526 U.S. 398, 414 (1999). In *Sun-Diamond*, the indictment did not allege "a specific connection" between the things of value that were conferred on the Secretary of Agriculture and the matters in which the defendant had an interest in favorable treatment from the Secretary, and the district court instructed the jury that it was "sufficient for the indictment to allege that [the defendant] provided things of value to [the Secretary of Agriculture] because of his position." *Id.* at

22

402-03. The Court "refus[ed] to read [the illegal gratuity statute] as a prohibition of gifts given by reason of the donee's office," *id.* at 408, and, in reversing the conviction, held that a violation requires that "some particular official act be identified and proved," *id.* at 406.

This Court considered the scope of the "official act" element in *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007) (en banc). In that case, a police officer was convicted of receiving illegal gratuities for accepting money from a confidential informant in exchange for accessing police databases for information about license-plate records and outstanding warrants. The Court reversed the conviction because it found that the defendant's actions, which amounted to "moonlighting" or "misuse of government resources," did not constitute "official acts." The Court explained that Section 201(a)(3)'s second prong ("any question, matter, cause, suit, proceeding or controversy") "refers to a class of questions or matters whose answer or disposition is determined by the government" and that the payments to Valdes were not for a decision that the government actually makes. *Id.* at 1320-24.

Finally, to constitute an illegal gratuity, the defendant must accept the gift knowing that it "was being given for" the particular official act. *United States v. Brewster*, 506 F.2d 62, 76 (D.C. Cir. 1974); *see also id.* at 77 ("What is outlawed is

23

only the knowing and purposeful receipt by a public official of payment, made in consideration of an official act, for himself."). The government need not prove, however, that the defendant performed or intended to perform the particular official act. *See United States v. Brewster*, 408 U.S. 501, 527 (1972) ("Although the indictment alleges that the [gratuity] was given for an act that was actually performed, it is . . . unnecessary to inquire into the act or its motivation. To sustain a conviction it is necessary to show that appellee [a former U.S. Senator] solicited, received, or agreed to receive, money with knowledge that the donor was paying him compensation for an official act. Inquiry into the legislative performance itself is not necessary; evidence of the Member's knowledge of the alleged briber's illicit reasons for paying the money is sufficient to carry the case to the jury.").

### 2.     The Evidence Was Sufficient on Counts 1 and 2.

Viewed in the light most favorable to the verdict, the evidence established that at the time Verrusio accepted the gift: (1) the reauthorization of the Highway bill was the House Transportation Committee's primary responsibility, App. 190; Supp.App. 131; (2) it was Verrusio's job, as the Policy Director for the Committee, to consult with industry groups and to advise Chairman Young and other members of the Committee on legislative policy, App. 188, 190; Supp.App. 130;

24

(3) Verrusio was specifically involved in matters pertaining to the Highway Bill's reauthorization, *e.g.*, Supp.App. 46, 129, 131; and (4) Verrusio was already working with United Rentals' lobbyists on their "package of amendments" and had discussed a strategy to achieve the company's objectives with Blackann, App. 220-21.

From that evidence, the jury could reasonably conclude that Verrusio knew that Ehrlich and Hirni invited him on the World Series trip because they wanted to reward Verrusio's past and future help in getting the United Rentals amendments into the Highway Bill. Indeed, Verrusio admitted to FBI Agent James Harless that he was "asked to go because Ehrlich and Hirni wanted to get something done on the United Rentals agenda." Supp.App. 47.

Other evidence supported that conclusion. The fact that Hirni and Ehrlich also invited Blackann, whom Verrusio knew was actively helping the lobbyists with their proposals, provided further insight into the donors' motivation, and Verrusio began earning his reward almost immediately. During the dinner at Sparks, Verrusio, as "the senior guy at the table," led the discussion and "walked" Hirni and Ehrlich though the legislative strategy that Verrusio and Blackann had previously decided was "the best chance for ultimate success." Supp.App. 27. Following the trip, Hirni reported to Boulanger that he thought Verrusio "was

25

going to be helpful," App. 197, and Hirni solicited that help within a few days of his return by sending Verrusio legislative materials on the amendments that United Rentals was "pushing," Supp.App. 79.

The jury could also infer that Verrusio knew that the trip was an improper gratuity from his false statements to FBI Agent Harless during a September 2008 interview.  Verrusio stated that he had never met "the client," meaning United Rentals, and he initially denied that Hirni had lobbied him on United Rentals' behalf and that Boulanger, Hirni, or anyone else representing United Rentals had offered him tickets to any sporting events.  Supp.App. 46.  The jury could reach the same inference from Verrusio's failure to include the trip on his financial disclosure form.  *See* pages 46-53 *infra*; *see United States v. Shabban*, 612 F.3d 693, 697 (D.C. Cir. 2010) (defendant "evidenced consciousness of guilt" by falsely telling his roommate about the events in question).

Contrary to Verrusio's contentions (Br. 28-34), the proof does not run afoul of either *Valdes* or *Sun-Diamond*.  Unlike *Valdes*, the actions to be performed were on a pending matter subject to resolution by the government *(i.e.*, whether the Transportation Committee should include the amendments in its bill).  *See Valdes*, 475 F.3d at 1324 (including in the class of questions decided by the government "Should the Congress enact new legislation regulating corporate directors?").  In

26

keeping with *Valdes*, the court instructed the jury that the five terms in the statutory definition of "official act" "refer to a class of questions or matters whose answer or disposition is determined by the Government." Supp.App. 135. Unlike *Sun-Diamond*, the indictment charged, and the jury could reasonably conclude, that there was a nexus between the World Series trip and a specific official act. Also, unlike *Sun-Diamond*, the jury was specifically instructed that it could not convict if it found "that the intent was limited only to the cultivation generally of a business or political relationship," or "that the defendant accepted the gratuity simply because of his position." Supp.App. 135.

Verrusio's specific challenges to the "official act" element are fundamentally flawed. To begin with, although he styles his claim as a challenge to the sufficiency of the evidence, he primarily attacks the allegations in the indictment. Verrusio focuses on the wrong thing. Because "[t]his Circuit treats the question whether an action constitutes an 'official act' as one of 'sufficiency of evidence.'" *United States v. Ring*, --- F.3d ---, 2013 WL 276020, at *7 (D.C. Cir. Jan. 25, 2013), the appropriate inquiry is whether the evidence at trial, when viewed in the light most favorable to the government, sufficiently satisfied the statute's "official act" requirement.

27

Verrusio's arguments also fail on their own terms. First, he ignores the charging language in Count 2 that describes the official act as "official assistance provided and to be provided to Equipment Rental Company's efforts to secure favorable amendments to the Federal Highway Bill," App. 44, and instead considers in isolation each of the five examples that follow. Thus, he argues that Acts 2 through 5 do not pertain to a "matter" that is decided by the government because they are directed to questions asked by others (*e.g.*, "What should Mr. Blackann do?"; "How should Mr. Hirni and Mr. Boulanger conduct their lobbying activities?"). Br. 29. In each case, however, as the evidence showed, Verrusio was providing specific advice to the interested parties on the overriding question of how to win passage of the amendments, and the advice was part and parcel of his official "actions" on a "matter" that the Transportation Committee would decide. Similarly, Verrusio's contention that Acts 1 and 3 lack specificity is beside the point when the specific "official act" is assisting United Rentals win passage of the amendments.

Second, it does not matter, as Verrusio claims (Br. 30), that he was not responsible for actually drafting the legislation or deciding ultimately whether the bill would include the amendments. *See Ring*, 2013 WL 276020, at *8 ("Ring's attempt to import a requirement that the official in question have ultimate

28

decisionmaking authority into the definition of 'official act' has no statutory basis."); *United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision.").  In *Carson*, the defendant, an administrative assistant to a Senator, attempted to persuade Department of Justice officials to quash a federal indictment, and the court explained that "the primary source of any conceivable influence . . . was the official position held by [the defendant], enhanced as it was by the status of his employer's membership in the one most powerful congressional committee affecting the Department of Justice's operations."  *Id.* at 434 (internal quotation marks omitted).

Verrusio's position as Policy Director for the Transportation Committee made him similarly influential.  Witnesses testified that Verrusio advised the Committee on legislative policy, and Verrusio admitted to Agent Harless that "one of the most important pieces of legislation that he worked on while he . . . worked for the committee was the Highway Transportation Bill."  Supp.App. 46.  Although his "main role" was "on the political side of things," "he was involved in the legislative process, and . . . working with Don Young."  Supp.App. 46.

29

"[B]ased on his position," Verrusio "had the ability to come in at the last minute and do something different" to the version of the bill that the subcommittee staffers had toiled on for the past two years. Supp. App. 43. The jury could also conclude from Verrusio's conduct after the World Series trip that his responsibilities included proposing or advocating specific legislation. Verrusio solicited from Hirni legislative language that United Rentals "would want in the perfect world," Supp.App. 10; informed Hirni that Verrusio was "good to go" with their "legislative asks," App. 271; informed Boulanger that the markup to the bill was scheduled to take place in about two weeks and that Verrusio was "[s]till hard at it," Supp.App. 13; and reassured Boulanger that, despite the opposition to the United Rentals amendments, "we still feel good," Supp.App. 13-14. Verrusio's attendance at the "preconference" meeting during which staff members attempted to reconcile the noncontroversial differences between the Senate and House bills, *see* Supp.App. 36-37, also demonstrated that Verrusio could influence the decision whether to place specific provisions in the bill.

Third, Verrusio's challenges are premised on the erroneous assumption that the government had to prove that Verrusio took, or contemplated taking, a "direct action" to influence the legislation. *See* Br. 31-36. As discussed above, it is not an element of the gratuity offense that the public official take or intend to take the

30

donor's hoped-for action.  *See* page 24 *supra*; *cf. United States v. Anderson*, 509 F.2d 312, 332 (D.C. Cir. 1974) (rejecting claim that defendant's conviction for bribing public official and public official's conviction for accepting an illegal gratuity were "per se inconsistent"; "[T]he donor may be convicted of giving a bribe despite the fact that the recipient had no intention of altering his official activities, or even *lacked the power to do so.*") (emphasis added).  Verrusio conceded that point below when he agreed with the substance of the court's response to the jury note.  *See* Supp.App. 161-62.  Although Verrusio did, in fact, assist United Rentals and its lobbyists in their efforts to insert the amendments into the bill, and the jury could consider that evidence to determine whether, when Verrusio accepted the trip, he understood that the lobbyists gave it to him "for or because" of official acts they hoped he would perform in the future, the government was not required to prove that he engaged in such conduct.[3]

---

[3] Verrusio cites (Br. 35 n.9) several cases that describe an illegal gratuity as one in which the payor intends to reward the public official for, among other things, an act that the official has "already committed to take." Those statements were made in the context of distinguishing bribes from illegal gratuities and contrasted a public official's specific future act that the payor intended as a quid pro quo for the bribe from a gift for actions that the public official is "committed to take" as part of his job responsibilities. The cited cases, which all involved prosecutions of payors under 18 U.S.C. § 666, did not address the intent requirements for convicting an official under Section 201(c)(1)(B). To the extent that they suggest that the government must prove that the defendant intended to take a specific action on behalf of the payor at the time he accepts the gift, they

31

At bottom, although Verrusio argued at length that the World Series trip was a legitimate factfinding mission and that he was not involved in the efforts to incorporate the United Rentals amendments into the Highway Bill, the properly instructed jury was free to reject that defense and reach the different, and much more logical conclusion, that Verrusio could influence the bill and that the lobbyists offered him the trip for or because of his help on the bill.

## II. The District Court Did Not Violate Verrusio's Fifth And Sixth Amendment Rights By Quashing The Trial Subpoena To A Former Congressional Aide Who Invoked Her Testimonial Privilege Under The Speech Or Debate Clause.

Verrusio contends (Br. 38-49) that the district court committed reversible error by granting a former Congressional staffer's motion to quash a subpoena ad testificandum based on her invocation of privilege under the Speech or Debate Clause. Verrusio also claims that the district court should have granted his motion

---

are inconsistent with this Court's and the Supreme Court's statements in *Brewster*. *See* pages 23-24 *supra*; *see also Sun-Diamond*, 526 U.S. at 404 (in contrast to a bribe, an illegal gratuity "may constitute merely a reward for some future act that the public official will take (and *may* already have determined to take")) (emphasis added); *cf. United States v. Hoffman*, 556 F.3d 871, 876-77 (8th Cir. 2009) (rejecting defendant/payor's argument that evidence of illegal gratuity was insufficient because public official never "committed" to action on payee's behalf); *United States v. Ahn*, 231 F.3d 26, 31 (D.C. Cir. 2000) (describing "three forms" that an illegal gratuity can take and distinguishing between "an enticement to maintain a position already taken" and "an inducement to take or refrain from some official act").

to dismiss the indictment because the unavailability of the witness deprived him of his right to present a defense.  His first claim is waived; the second is without merit.

###   A.     Background.

Verrusio issued a trial subpoena to Vivian Curry, who, during the relevant time period, was legislative director for then-Congressman Boozman.  Although she had voluntarily submitted to two interviews with defense counsel, she moved to quash the subpoena because her testimony was privileged under the Speech or Debate Clause, U.S. Const., art. I, § 6, cl. 1.  App. 131-42.  As her motion explained, the Speech or Debate Clause protects from disclosure all activities "within the legislative sphere," and its protections extend to Congressional staff. App. 137-138.  Upon receiving notice of Curry's motion, Verrusio moved to exclude two previously-admitted government exhibits (GX 88 and 130, App. 412-17) that contained email chains between Curry and Hirni.  Supp.App. 132.

Although Curry's motion did not specifically address the application of her privilege to the exhibits, the hearing on the motion to quash primarily focused on that issue.  In response to the court's questions, counsel to the House of Representatives asserted that the Speech or Debate Clause privilege extended to Curry's email communications to Hirni, thereby protecting them from disclosure.

33

App. 327-35.  Defense counsel agreed. App. 336 ("[T]he defense fully recognizes the high hurdle that the Speech or Debate clause imposes here, and we really don't have many quibbles with House counsel's brief."); App. 337 ("I believe that the Speech or Debate clause in fact does appear to cover those communications" [in the emails]).  The court ruled that "the House counsel has appropriately invoked the Speech or Debate clause privilege, which would in effect preclude the witness, Vivian Curry Moeglein, from testifying," and granted the motion to quash.  App. 338.

The court then considered defense counsel's proposal to strike government exhibits 88 and 130 and the related testimony from the record.  Defense counsel argued that "we're confronted with both a fairness issue and a confrontation clause issue" because "a witness who . . . everyone thought would be available, who would be able to testify about her own statements, now is not being permitted to testify."  App. 339.  According to defense counsel, the email evidence on its face suggested that Verrusio "through Ms. Curry's words" was attempting to influence the legislation and advocate on behalf of United Rentals' amendments, and, without Curry's anticipated testimony that Verrusio did not "insert[] himself into the process" or "plac[e] pressure on her," the defense was "now unable to rebut the clear implications of this e-mail."  App. 340-42.

34

The issue was not litigated further because the parties agreed to redact Curry's statements from the email chains, strike the testimony that described those statements and the witnesses' interpretation of her emails, and preclude argument about Curry's conduct. App. 361-62, 366-68. Nevertheless, Verrusio moved to dismiss the indictment because Curry's unavailability violated his Sixth Amendment right to confrontation. App. 365-66. His only showing as to the materiality of Curry's anticipated testimony was a proffer that "she would provide much greater context and factual evidence that would support our theory of the case." App. 369. The court denied the motion and adhered to its ruling after Verrusio clarified that he was also relying on his right to compulsory process. App. 371, 376.

During summation, the government mentioned Curry only once as the recipient of Hirni's email stating that "I've spoken to Fraser and he is good to go" and "Fraser asked us to give him the language plus what we'd want in the perfect world." Supp.App. 137-38. Defense counsel, on the other hand, repeatedly referred to Curry, along with other staffers who were specifically tasked with drafting legislation, to argue that they – and not Verrusio – were the focus of the lobbyists' attention. *See* Supp.App. 143-45, 148, 153-59.

35

## B.    Standard Of Review.

This Court should not consider Verrusio's claim that the district court erred by failing to balance the constitutional rights at issue because he waived it below. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted); *United States v. Stearns*, 387 F.3d 104, 108 (1st Cir. 2004) ("arguments which have been affirmatively waived are not normally reviewable on appeal"). If not waived, Verrusio's claim is reviewed, at best, for plain error. *United States v. Taylor*, 497 F.3d 673, 676 (D.C. Cir. 2007) (argument for dismissal not raised below is reviewed for plain error).  Under that standard, the Court "will correct a district court's error only if (1) there is in fact an error to correct; (2) the error is 'plain'; (3) it 'affects substantial rights'; and (4) it 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Ibid.* (quoting *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)).

Verrusio's claim that the district court erred by denying his motion to dismiss the indictment as a result of Curry's unavailability is reviewed de novo. *United States v. Akhigbe*, 642 F.3d 1078, 1082 (D.C. Cir. 2011).

**C.  Verrusio Waived His Challenge To The District Court's Order Granting Curry's Motion To Quash The Subpoena; In The Alternative, The District Court Did Not Plainly Err.**

This Court should not review Verrusio's challenge to the district court's order granting Curry's motion to quash because defense counsel agreed, without qualification, that "the Speech or Debate clause in fact does appear to cover [Curry's] communications."  App. 337.  *See Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (plaintiff waived objection to substitution of the United States for its employee because plaintiff stated to the district court that "he could 'not in good faith' oppose the motion"); *Stearns*, 387 F.3d at 108 (defense counsel's affirmative acceptance of court's ruling rendered issue unreviewable on appeal).  Verrusio did not ask the district court to balance Curry's privilege against his own constitutional rights and deny the motion to quash on that basis; instead, he argued only that, in light of Curry's invocation of the testimonial privilege, the court should strike the already-admitted evidence of her statements.

Even if this Court were to consider Verrusio's claim that the Speech or Debate privilege is not absolute and the district court should have balanced the burden on the legislative process against Verrusio's right to a fair trial, Verrusio has not demonstrated that the district court erred, let alone plainly erred.  As Verrusio concedes (Br. 39), no court has even considered whether a district court

37

must balance the competing rights of a criminal defendant against a legislator's (or congressional aide's) testimonial privilege under the Speech or Debate Clause.[4] In fact, Verrusio's proposed balancing test makes no sense when the Speech or Debate Clause privilege is on one side of the balance. It is undisputed, at least in the civil context, that "when the privilege applies it is absolute," *Brown & Williamson v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995) (citing *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503 (1975)), and "there is no reason to believe" that the absolute bar "does not apply in the criminal [context] as well," *United States v. Rayburn House Office Building, Room 2113, Washington, D.C.*, 497 F.3d 654, 660 (D.C. Cir. 2007).[5] As a result, the privilege "admits of no

---

[4]  As Verrusio notes (Br. 39), this Court declined to address the issue in *United States v. Levine*, 72 F.3d 920, 1995 WL 761834 (D.C. Cir. 1995) (Table), because the case was to be remanded on other grounds. The Court deemed it "terribly unwise" to deviate from the principle that "courts should resist deciding constitutional questions they are not required to decide," especially when the issue "on the merits, poses a complicated question with no bright line answer." 1995 WL 761834, at *4-*5.

[5]  In *Brown & Williamson*, this Court stated in dicta that the Supreme Court's "sensitivities" in *Gravel v. United States*, 408 U.S. 606 (1972), "to the existence of criminal proceedings against persons other than Members of Congress at least suggest that the testimonial privilege might be less stringently applied when inconsistent with a sovereign interest, but is 'absolute' in all other contexts." *Brown & Williamson*, 62 F.3d at 419-420. *Rayburn* subsequently explained that "this observation . . . is relevant, if at all, to the question of remedy for a

balancing." *Id.* at 662; *see also Eastland,* 421 U.S. at 509 n.16 ("Where we are presented with an attempt to interfere with an ongoing activity by Congress, and that activity is found to be within the legitimate legislative sphere, balancing plays no part. The speech or debate protection provides an absolute immunity from judicial interference."). Instead, the only room for play is in deciding whether the particular activity falls within the scope of the Speech or Debate Clause at all. *See Rayburn*, 497 F.3d at 670-71 ("And while it is true that, once it attaches, the Clause 'is an absolute bar to interference' with legislators, *Eastland*, 421 U.S. at 503, . . . recognizing that the privilege is absolute once it attaches begs the question whether the Clause attaches to begin with.") (additional internal quotation marks and citations omitted) (Henderson, J., concurring); *cf. United States v. Renzi*, 651 F.3d 1012, 1021 (9th Cir. 2011) ("Because the protections of the Clause apply absolutely when they apply, the limits of what may constitute a protected 'legislative act' is of fundamental importance.") (quoting *Eastland*, 421 U.S. at 503), cert. denied, 132 S. Ct. 1097 (2012).[6]

-----

violation, not the determination of whether a violation has occurred." 497 F.3d at 663.

   [6] Verrusio implicitly recognizes that point when he formulates "the actual question" as "what is the potential burden on the functioning of Congress" if Curry were to testify about the influences brought to bear on the legislative process." Br. 45. Because Verrusio has never argued that Curry's testimony was

Verrusio's observation that courts "often apply a balancing test when confronted with competing constitutional interests" (Br. 41) has no bearing here. Unlike the Speech or Debate Clause privilege, the privileges at issue in the cases Verrusio cites (reporter's First Amendment privilege; president's executive privilege; confidential informer's privilege; executive's "privilege" to withhold national-security-related evidence) are neither absolute nor expressly conferred under the Constitution.  See *Branzburg v. Hayes*, 408 U.S. 665 (1972) (refusing to recognize a constitutional testimonial privilege for reporters); *United States v. Nixon*, 418 U.S. 683, 711-713 (1974) (executive privilege is not absolute because it is "based only on a 'generalized' interest in confidentiality" that, although "constitutionally based," is not explicitly referenced in the Constitution); *Rovario v. United States*, 353 U.S. 53, 59-60 (1957) (the informer's privilege is based on "the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation").  Significantly, Verrusio does not cite any cases in which a court has required a witness to waive an absolute testimonial privilege because, on balance, a criminal defendant's need for the evidence takes

---

not protected under the Speech or Debate privilege – and, in fact, conceded to the contrary – that issue is not presented in this appeal.

40

precedence.  *Cf. Jaffee v. Redmond*, 518 U.S. 1, 15, 17 (1996) (recognizing psychotherapist-patient privilege under Fed. R. Evid. 501 and rejecting lower court's "balancing component of the privilege"; "Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege."); *United States v. Moussaoui*, 382 F.3d 453, 466 (4th Cir. 2004) ("Nothing in the Fifth Amendment, or in any other constitutional provision, provides a means for overcoming this privilege [against self-incrimination] once a potential witness has invoked it.").

Even if this Court were to decide whether the district court erred by failing to balance the competing constitutional interests, the absence of controlling precedent defeats Verrusio's claim under plain error review.  *See United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011) ("Absent controlling precedent on the issue or some other absolutely clear legal norm, the district court committed no plain error.") (internal quotation marks and citation omitted).  And, as we argue below, Verrusio's claim also fails because he has not shown that the excluded testimony was material.  *See* pages 44-46 *infra*.

41

**D.     The District Court Did Not Err In Denying Verrusio's Motion To Dismiss The Indictment.**

The district court also did not err in denying Verrusio's motion to dismiss the indictment based on Curry's unavailability. A defendant does not possess an unfettered right to evidence under the Sixth Amendment's Compulsory Process Clause. *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); *Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967) (right to compulsory process does not displace testimonial privileges; "Nothing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination or the lawyer-client or husband-wife privileges, which are based on entirely different considerations from those underlying the common-law disqualifications for interest."); *Moussaoui*, 382 F.3d at 466 n.18 (if separation of powers principles placed witnesses "beyond the reach of the district court," . . . "then Moussaoui would not have an enforceable Sixth Amendment right to the witnesses' testimony"); *United States v. Edmond*, 52 F.3d 1080, 1109 (D.C. Cir.1995) ("the accused's right to compulsory process does not include the right to compel a witness to waive his fifth amendment privilege") (internal quotation marks and citation omitted); *United States v. Turkish*, 623 F.2d 769, 773-74 (2d Cir. 1980)

42

("Traditionally, the Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does not carry with it the additional right to displace a proper claim of privilege."). A defendant's right to a fair trial under the Due Process Clause similarly does not override the assertion of a lawful privilege. *See Turkish*, 623 F.2d at 777 (Due Process Clause "does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges"). At most, a trial court may strike the direct testimony of a witness who lawfully invokes a privilege during cross-examination to remedy a Confrontation Clause violation, which is essentially the remedy that Verrusio agreed to below. *See generally* 23 Wright and Graham, *Federal Practice and Procedure*, § 5436 at 889 & nn. 29, 30.

Verrusio's contention that the case should be dismissed in its entirety is unsupported. With one exception (*see* footnote 7), the cases that he cites in support of that remedy, *see* Br. 48-49, involve the government's assertion of its own privilege. In those circumstances, it is up to the government to decide whether its interest in confidentiality outweighs its interest in prosecution. *See United States v. Reynolds*, 345 U.S. 1, 12 (1953) ("The rationale of the criminal cases [holding that the government can invoke its evidentiary privileges only at the price

43

of letting the defendant go free] is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense."). That rationale does not apply where, as here, the availability of the testimony is not under the prosecution's control.[7]

Finally, Verrusio has not demonstrated that Curry's testimony would have been "both material and favorable to the defense," *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (standard for establishing violation of right to compulsory process), or that "absence of . . . fairness fatally infected the trial, *id.* at 872 (standard for establishing violation of due process). In fact, Verrusio made no such showing below and argued only in general terms that Curry "would provide much greater context and factual evidence that would support our theory of the case." App. 369. *See Valenzuela-Bernal*, 458 U.S. at 871, 873 ("respondent can establish no Sixth Amendment violation without making some plausible

---

[7] *Christoffel v. United States*, 200 F.2d 734, 739 (D.C. Cir. 1952), *judgment vacated* by 345 U.S. 947 (1953), approved, in principle, the application of the *Reynolds* justification to "evidence in the custody of the House of Representatives." *Id.* at 739. The Court did not explain its statement further and had no occasion to apply it to that case. We are unaware of any case that has applied that dicta.

44

explanation of the assistance he would have received from the testimony of the [unavailable] witnesses," "in ways not merely cumulative to the testimony of available witnesses," and preferably "verified by oath or affirmation of either the defendant or his attorney").

Even on appeal, Verrusio claims only that Curry would have testified that Verrusio "never told her that he intended to do anything to advance [United Rentals'] agenda," and that Verrusio "had no substantive role or influence in the legislative drafting process." Br. 47. Such testimony was hardly "essential." *See* Br. 47. Once Curry's emails were redacted from the exhibits and corresponding testimony, the emails did not "imply" that Verrusio had discussed the amendments (or anything else) with her, and Verrusio had nothing to rebut. The fact that Verrusio never told Curry, in particular, that he intended to "advance" the amendments is of marginal relevance. Nor was Curry's testimony needed to explain Verrusio's role "in the legislative drafting process" because other witnesses could – and did – provide the same information. Verrusio's fellow staffer, Raga Elim, agreed that, as Policy Director, "[Verrusio] was responsible for dealing with, reviewing, and having oversight regarding legislation and legislative policy for the Transportation Committee." Supp.App. 130. He also explained that others did the actual drafting. Supp.App. 127; *see also*, *e.g.*, Supp.App. 11-12 (Boulanger

45

testifies that Verrusio "deal[t] more with some of the bigger issues that industry, K Street folks like myself were concerned with" and that subcommittee staffers Levon Boyagian and Graham Hill "were the technical people piecing together the actual bill language and doing that sort of work"); Supp.App. 40 (Blackann testifies that Boyagian and Graham are "subcommittee guys for the T & I Committee" who draft legislation); Supp.App. 82-83 (Hirni describes job of subcommittee staffers who are responsible for drafting amendments to legislation and are also policy experts).  Because Verrusio had no unfettered right to Curry's testimony and failed to show it would be material and favorable, he cannot establish a violation of his Fifth or Sixth Amendment rights.

### III.    The Evidence Was Sufficient To Support Verrusio's False Statement Conviction.

Verrusio contends (Br. 49-52) that the government failed to prove that he knowingly provided material false information on Schedule VI of his 2003 financial disclosure statement.  The evidence amply supports the verdict.

### A.    Background.

Count 3 of the superseding indictment alleged that Verrusio knowingly and willfully made a material false statement on his 2003 Financial Disclosure Form and attached schedules, in violation of 18 U.S.C. §§ 1001(a)(2) and (c)(1), by falsely certifying that the statements on the form were "true, complete and correct

46

to the best of my knowledge and belief" when he knew that they were "untrue, incomplete, and incorrect, in that they did not (a) identify Hirni and Equipment Rental Company as the source of a reportable gift; (b) did not describe the World Series Trip and related gifts; and (c) did not report the value of the World Series Trip and related gifts." App. 47-48.

The government notified Verrusio that it intended to call an expert witness to testify about House rules governing the financial disclosure statement, and Verrusio filed a motion in limine to preclude the testimony. In arguing that the expert testimony was not necessary, Verrusio asserted, among other things, that the financial disclosure report "essentially speaks for itself," App. 451 and that "Count 3 was "quite a simple count on its face," Supp.App. 3-4. Although the court "disagree[d]" with both parties that "this is the kind of a form that's so plain that an ordinary juror would be able to appreciate all of its meanings, all of what it requires," it ruled that "it would [not] be inappropriate to allow someone with proper qualifications and experience to go through the entries on the form to explain what the form is and . . . how it's to be filled out." App. 455.

The government did not call an expert witness at trial. Instead, Paul Lewis, the House Ethics Committee investigator who reviewed Verrusio's 2003 financial disclosure statement, testified about the form and Verrusio's responses. Lewis

47

briefly described the form's format and explained that filers who answered "yes" to any of the nine questions eliciting "preliminary information" on the form's first page were instructed to complete and attach additional schedules to their statement. Supp.App. 94, 97. The front page of the form stated that it "was required by the Ethics in Government Act of 1978 as amended"; that it "will be reviewed" by the House Ethics Committee; and that "[a]ny individual who knowingly and willfully falsifies, or who knowingly and willfully fails to file this report may be subject to . . . criminal sanctions." Supp.App. 101-02. Lewis reviewed the filed forms for timeliness, accuracy, completeness, and compliance with applicable laws and rules. Supp.App. 95.

Verrusio filed his financial disclosure statement for calendar year 2003 on June 15, 2004, and signed the certification stating that "the statements I have made on this form and all attached schedules are true, complete and correct to the best of my knowledge and belief." App. 404; Supp.App. 98, 102. He answered "yes" to five of the preliminary questions, including the inquiries about "reportable gifts" and "travel payments and reimbursement" and attached the five corresponding schedules. He filled out four of the Schedules; Schedule VI, which required the filer to report the source, description, and value of gifts, was left blank. And, although Verrusio listed four trips on Schedule VII, which pertained

48

to "travel payments and reimbursements," he did not disclose the World Series trip.  App. 408-09; Supp.App. 100, 103-04.

After preliminarily reviewing Verrusio's 2003 financial disclosure statement, Lewis emailed Verrusio on June 30, 2004 about Schedule VI:  "On Page 1 the box for Sch VI "Gifts" is checked "yes" but no[] information is reported.  Thank you for your attention to this matter."  Supp.App. 105-06. Verrusio responded on July 1 (although Lewis did not get the information until December 9 when Verrusio resent it in response to Lewis's renewed request) by stating that "Schedule VI 'gifts' section should be checked 'no.'"  Supp.App. 106-08.  Lewis then thanked Verrusio for the information and told him to provide it to the Clerk's office "in the form of a brief amendment letter and you'll be all set." Supp.App. 109.  Verrusio did not reply to that email, and Lewis sent him another email on January 26, 2005, asking whether Verrusio was "able to file the amendment with the clerk last month?"  Supp.App. 110.  Verrusio again did not respond.  Before leaving his job on April 2, 2005, Lewis put a handwritten note on his copy of the January 26 email stating "no response.  FD [financial disclosure] not approved."  Supp.App. 111-12.

## B.   Standard Of Review.

*See* page 21 *supra*.

49

**C.    The Evidence Was Sufficient To Prove That Verrusio Knowingly Omitted Information In Schedule VI And Made A Material False Statement When He Certified That His Financial Disclosure Report Was Accurate.**

To prove that Verrusio made a false statement in violation of 18 U.S.C. § 1001(a)(2), the government must prove that he "(1) 'knowingly and willfully' (2) '[made] any materially false, fictitious, or fraudulent statement or representation' (3) in a 'matter within the jurisdiction of the . . . [legislative] branch of the Government of the United States.'"  *Moore*, 612 F.3d at 700.[8]  "[A] statement is material if it has a natural tendency to influence, or is capable of influencing, either a discrete decision or any other function of the agency to which it was addressed."  *Id.* at 701.  *See also United States v. Stadd*, 636 F.3d 630, 638 (D.C. Cir. 2011) (same).

Verrusio's admissions during his interview with FBI agents support his conviction by themselves.  Verrusio admitted that he was aware of the reporting requirements, that he knew they were important, and that he knew he should have reported the trip.  Supp.App. 49.  Verrusio also admitted that "it didn't look good" that a lobbyist and his client, who had business before the Transportation Committee, took Verrusio on an all-expenses-paid trip to New York for the World

---

[8]  Verrusio does not challenge the government's proof on the third element.

Series, and the Ethics Committee would not have sanctioned the trip.  Supp.App. 48-49.

Verrusio was right.  *See* pages 24-25 *supra*.  The jury could reasonably infer that Verrusio knowingly and willfully failed to disclose the gifts on Schedule VI because he knew that the trip was improper.    Verrusio's subsequent misrepresentation that the "gifts section should be checked no" when Lewis brought the matter to Verrusio's attention and Verrusio's failure to file an amended report additionally support the inference that the omission was not an unintentional mistake.

Contrary to his position below, Verrusio now claims that a reasonable juror could not have convicted him without "testimony regarding the official rules, standards, and practices of the House or the Transportation Committee with respect to official travel."  Br. at 49-50.  That argument is wrong for several reasons.  First, there was no need for expert or lay testimony on that issue because all the participants, including Verrusio, agreed that the trip did not involve official factfinding and was instead planned around the World Series game.  App. 223 (Blackann);  Supp.App. 44 (Blackann), Supp.App. 49 (Verrusio's admissions); App. 251 (Hirni); App. 287 (Hirni); Supp.App. 88 (Ehrlich).  As Verrusio admitted to Agent Harless, the World Series trip was not "official travel"; to report that it

51

was would have required Verrusio to "misrepresent[] what the trip actually was." Supp.App. 49.

In addition, as Verrusio strenuously argued below, expert testimony was unnecessary because the financial disclosure form, especially when considered alongside the instructions to Schedule VI (Defense Exhibit 149),[9] was "self-explanatory." Supp.App. 2. Although the district court preliminarily ruled that expert testimony was not "inappropriate," App. 455, it never stated that such proof was necessary, and it rejected the identical argument in Verrusio's post-trial motion for judgment of acquittal. App. 435. The jury could reasonably conclude from the face of the form, the instructions to Schedule VI, Verrusio's admission that the trip was not official travel (as confirmed by his failure to report it on his Schedule VII), and the nature of the activities and items that Verrusio should have disclosed the value of the trip as a gift.

Verrusio's argument that the government failed to satisfy the materiality element of the offense also lacks merit. The evidence amply established that one of the functions of the House Ethics Committee and its staff was to ensure that the required disclosure statements were complete, accurate, and in compliance with

---

[9] Those instructions clearly stated that "[a]ll types of gifts, including travel-related expenses provided for your personal benefit, must be reported on Schedule VI. App. 423. *See* page 55 *infra*.

52

the "Ethics in Government Act," and Verrusio himself admitted that the disclosure requirements were "very important" and "a serious matter." Supp.App. 49. Verrusio's false certification that his statement was "complete and correct" when he knowingly failed to disclose the gifts was capable of – and did – affect Lewis's actions as a lawyer on the Ethics Committee. *Cf. Stadd*, 636 F.3d at 639 (defendant's misstatement in email to lawyer in NASA's general counsel's office was capable of influencing the NASA lawyer's actions; if defendant had "accurately reported the substance of his dinner conversation with [client of defendant's private consulting business], it would have raised red flags that would have led [lawyer] to inquire further"). Verrusio's admission that the trip "would not have passed the scrutiny of the Ethics Office," Supp.App. 49, also demonstrates that his misstatement adversely affected the Ethics Committee's ability to perform its function of monitoring compliance with the governing House ethics rules. The sufficiency of the Count 3 evidence is beyond question.

### IV.   The District Court Did Not Abuse Its Discretion In Excluding The Instructions For Completing The Travel Disclosure Sections Of The Financial Disclosure Statement.

In a related claim, Verrusio contends (Br. 52-59) that the district court committed reversible error by excluding the instructions for completing Schedule VII of the financial disclosure statement. The instructions were not relevant and

were likely to confuse the jury. The district court did not abuse its discretion in refusing to admit them.

### A. Background.

During his cross-examination of Lewis, defense counsel offered into evidence four pages from the instructions for completing the financial disclosure statement, including those pertaining to the disclosure of "travel payments and reimbursements." App. 310-313. In response to the government's objection that the evidence was irrelevant, Verrusio argued that travel and gifts "go together" and that a filer would have to consider the instructions on gifts and travel to determine on which schedule the item should be disclosed. App. 316-17. The district court agreed with the government and admitted only the instructions pertaining to gifts. App. 316-17.

### B. Standard Of Review.

This Court reviews the district court's decision to exclude evidence for an abuse of discretion. *United States v. Hall*, 613 F.3d 249, 256 (D.C. Cir. 2010), cert. denied, 131 S. Ct. 1471 (2011).

### C. The District Court Did Not Abuse Its Discretion In Excluding The Schedule VII Instructions.

The district court acted well within its discretion in excluding the instructions for completing the official travel section of the financial disclosure

statement.  As the court noted, Verrusio was not charged with failing to disclose

official travel, App. 316, and the instructions could have confused the jury by

suggesting that it had to decide whether Verrusio was legally obligated to disclose

the trip on Schedule VII.

Verrusio's argument that the Schedule VII instructions were "the best (and

only) evidence available" (Br. 54) to support his defense that the entire trip should

have been reported on Schedule VII instead of Schedule VI is unsupported.  First,

the instructions to Schedule VI, which were admitted into evidence, explained the

distinction between gifts reportable on Schedule VI and third-party payments for

official travel reportable on Schedule VII:

> All types of gifts, including travel-related expenses provided for your
> personal benefit, must be reported on Schedule VI.  However, travel
> (including food and lodging) in connection with official duties is reported
> separately on Schedule VII of FORM A, as discussed below.
> (Entertainment provided while on a fact-finding tour and reimbursements
> in excess of your travel expenses are considered gifts and may be accepted
> by a House Member, officer, or employee, if at all, only in accordance with
> the provisions of the House gift rule.

App. 423.

The instructions to Schedule VII are not additionally relevant.  The sole

provision that Verrusio quotes – "You must [also] disclose privately paid travel

that, while not related to your official duties, was not provided merely for your

personal benefit," Br. 54-55 (quoting App. 424) – does not define "merely for your

personal benefit" or override the Schedule VI instructions.  In fact, that provision

is not relevant here at all.  An earlier section of the instructions states that the

House gift rule permits an employee to accept private reimbursement for, among

other types of travel, "travel in connection with the individual's outside business

or other activities"; the subsequent examples of travel that "[were] not provided

merely for your personal benefit" and must be disclosed on Schedule VII include

"travel paid for by corporations that you or your family own, travel that is

necessary in connection with your service as an officer or board member of any

organization, and travel for job interviews."  App. 424.  Taken together, the

instructions make clear that the "not provided merely for your personal benefit"

provision applies to the filer's outside business-related travel and would not apply

to travel for baseball games, lap dances, and the like.  And, without additional

testimony on how the House Ethics Committee would apply its rules to Verrusio's

trip (which "would raise Speech or Debate objections" from House counsel, App.

315), the Schedule VII instructions were likely to confuse the jury and lead it far

afield from the charges in the indictment.

The Schedule VII instructions also were not necessary because the jury

heard other evidence that enabled it to consider Verrusio's defense that the New

York trip was "in connection with" Verrusio's official duties and disclosable only

56

on Schedule VII.   For example, Raga Elim testified that staffers "pretty frequently" traveled as part of their job responsibilities and that corporations or other third parties sometimes paid for the trips. Supp.App. 128.  He noted that the staffers "had some disclosure requirements" in connection with third-party travel, and "there had to be a business purpose for the travel." Supp.App. 128.  Elim also described a one-day factfinding trip that he and Verrusio had taken at Chairman Young's request. Supp.App. 129.  Tellingly, Verrusio reported that trip – but not the World Series trip – on Schedule VII, demonstrating that he understood that trips related to "official duties" had to be reported on Schedule VII rather than on Schedule VI.  Nothing in the Schedule VII instructions shed additional light on Verrusio's "ability to draw a line between gifts and travel-related expenses."  Br. 54.

Finally, Verrusio contends that the instructions were necessary to inform the jury that Verrusio was not required to obtain approval from the House Ethics Committee before taking the trip.  That was important, he argues, because the government "repeatedly asked its witnesses about whether Mr. Verrusio sought approval for the trip, clearly implying that approval was required."  Br. 55.

To begin with, Verrusio did not object to the questions or request an instruction that the rules did not require preapproval.  In any event, other evidence

57

established that preapproval from the Ethics Committee was not necessary, *see* App. 222 (Blackann testifies that preapproval by Ethics Committees is not required); Supp.App. 39 (same), and the government never asserted that it was.[10] Instead, it properly argued that Verrusio's failure to seek approval from Congressman Young, Verrusio's immediate supervisor, or the Ethics Committee supported the inferences that Verrusio knew that accepting the trip was a crime and that he intentionally concealed it. *See* App. 381-82, 385.

### D. Even If The Court Erred By Excluding The Evidence, The Error Was Harmless.

For the same reasons, even if the district court abused its discretion in excluding the Schedule VII instructions, the error was harmless because "it did not have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Coumaris*, 399 F.3d 343, 349 (D.C. 2005) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). As discussed above, the instructions were marginally relevant at best and cumulative of other evidence that travel "in connection with official duties" should be disclosed on Schedule VII and

---

[10] Although preapproval was not required, the instructions to Schedule VII would have informed the jury that Verrusio was required to file a disclosure statement "within 30 days of return." App. 424. Verrusio admitted to Agent Harless that he did not disclose the trip but knew "he should have." Supp.App. 49.

that preapproval for official travel was not required. *See United States v. Warren*, 42 F.3d 647, 656 (D.C. Cir.1994) (erroneous hearsay ruling was harmless because the excluded evidence "was cumulative of other evidence heard by the jury"). In addition, the evidence overwhelmingly established that Verrusio did not omit the World Series trip from Schedule VI because he believed it belonged on Schedule VII. Verrusio's entries on Schedule VII alone established that fact, *see* pages 48-49 *supra*, and Verrusio admitted to Agent Harless that he knew "he should have" disclosed the trip, but that to disclose the trip, he would have had to "misrepresent[]" its purpose and "[say] it was an official trip, when, in fact, it wasn't an official trip." Supp.App. 49.

Nor did exclusion of the instructions hamper Verrusio's defense. Relying on other evidence, Verrusio was able to argue at length that the trip was for business, *see* Supp.App. 139-42, 146-51; nothing in the excluded Schedule VII instructions could have bolstered that claim. Similarly, Verrusio was free to argue the uncontested point that prior approval by the Ethics Committee was unnecessary. *See* Supp.App. 151-52.

Finally, even if the instructions would have affected the jury's conclusion as to whether the dinner and related travel costs were in connection with Verrusio's "official duties," and there is no basis for that conclusion, the

59

chauffeured Cadillac Escalade, the clothing souvenirs, and the alcohol and lap

dances at the strip club were reportable as a gift because they exceeded the gift-

reporting threshold.[11]

_____

[11] Verrusio excludes the costs of the chauffeured Cadillac Escalade from his tally. The evidence established that the Escalade was used almost exclusively to transport the men to the non-business related activities and was not used to travel to and from the airports. *See* App. 256-57; Supp.App. 60-61, 67, 71, 76-77.

60

## CONCLUSION

The judgment of conviction should be affirmed.

Respectfully submitted,

LANNY A. BREUER
Assistant Attorney General

JOHN D. BURETTA
Deputy Assistant Attorney General

DAVID V. HARBACH, II
Deputy Chief
EMILY RAE WOODS
Trial Attorney
Public Integrity Section


s/ Kirby A. Heller
KIRBY A. HELLER
Attorney
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave., NW, Rm. 1264
Washington, DC 20530
Tel. 202-307-0085
kirby.heller@usdoj.gov

61

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Cir. R. 28(d) and 32(a), the undersigned counsel of record certifies that the foregoing Brief for the United States complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), inasmuch as the brief is proportionately spaced, has a typeface of 14 points or more, and contains 13,472 words. This certification is based on the word count of the word-processing system used in preparing the government's brief: WordPerfect for Windows, version X4.

s/ Kirby A. Heller
KIRBY A. HELLER

## CERTIFICATE OF SERVICE

I hereby certify that, on January 28, 2013, I electronically filed the foregoing Brief, and the Supplemental Joint Appendix, with the Court via the CM/ECF system, which will send the notice of docket activity to:

Richard P. Sobiecki                     Rosanna Taormina
Baker Botts L.L.P.                      Federal Public Defender's Office
1299 Pennsylvania Avenue, NW            625 Indiana Avenue, NW Suite 550
Washington, DC 20004                    Washington, DC 20004

I further certify that, on January 28, 2013, I hereby caused eight paper copies of the Brief, and seven paper copies of the Supplemental Appendix, to be filed with the Court via Federal Express, and caused two paper copies of the Brief and one paper copy of the Supplemental Appendix to be served via Federal Express on counsel for Appellant and Amici at the addresses above.

                          s/ Kirby A. Heller
                          KIRBY A. HELLER
                          Attorney
                          Criminal Division, Appellate Section
                          U.S. Department of Justice
                          950 Pennsylvania Ave., NW, Rm. 1264
                          Washington, DC 20530
                          Tel. 202-307-0085
                          kirby.heller@usdoj.gov

63